Williams, Judge,
delivered the opinion of the court:
This suit was instituted by Jacob Frank, now deceased. The administrators of Frank’s estate have been substituted as parties plaintiff.
Frank, in response to public proposal of the Surplus Property Division of the War Department to sell certain surplus drugs and chemicals at prices and in the minimum quantities stated in the proposal f.o.b. points of storage, bid upon and was awarded, omitting items not in suit, argyrol or equivalent, 128,075 ounces, and protargol or equivalent, 854,880 ounces. The decedent, under the terms of the proposal, made a deposit of $22,562.27, ten percent of the. amount of his bid. The claim is for a balance of $20,784.28 of the deposit applicable, to the argyrol and protargol awarded the decedent on his bid, which were not withdrawn and paid for by him.
The bid was submitted in the name of the Frank Lang-ham Company, a partnership entered into between the decedent and Frank Langham for the purpose of buying and selling surplus Government property. After the acceptance of the bid the award was made in the name of the decedent at the request of Frank Langham Company. Prior to the submission of the bid the Frank Langham Company had entered into a verbal agreement with reputed agents of the Russian Soviet Government whereby they were to purchase from the company the argyrol and protargol involved in suit and advance the money necessary for payment of the purchase price to the United States. Officials of the War Department having to do with the sale of the drugs were *525 informed of this arrangement by the decedent and Langham but had no part in it. Subsequent to the sale and within the time in which decedent was required to pay for the drugs, decedent, through his representative Langham, called upon the Soviet agents to furnish the funds necessary for payment to the Government of the purchase price of the argyrol and protargol. They refused to furnish the money or proceed in the matter until decedent had procured an •export license for the drugs to Eussia, which was required under the proclamation of the President, effective from February 16, 1918. Up to that time the decedent did not know of the existence of the embargo against exportation of goods from the United States to Russia, except by license. He made diligent efforts to obtain a license for the exportation of the drugs and chemicals but was unable to do so. Whereupon he requested cancellation of his contract of purchase, which was refused, but an extension of 90 days was granted him in which to make payment. During this 90-day period Langham, acting for the decedent, made diligent but unsuccessful efforts to dispose of the argyrol and protargol on the domestic market. The decedent being unable to sell the drugs could not pay for them and after the expiration of the 90 days’ extension of time requested that the articles be resold for the decedent’s account. The defendant proceeded to resell the available argyrol and protargol not withdrawn and paid for by the decedent for his account, at a price greatly below the price at which they had been sold to the decedent. The defendant has filed a counterclaim in which judgment is asked against plaintiffs in the amount of $118,031.15, the alleged loss sustained by defendant on the resale of the goods after crediting decedent with all the deposit money paid upon their purchase.
Plaintiffs predicate their right to recover the balance of the deposit money retained by the United States on the ground that the contract was void because the defendant was unable to deliver the drugs for export to Russia. It is contended that the Government, being unable to deliver the drugs for export because of the embargo, was no more able to perform the contract than it would have been had *526 it not owned or possessed drugs is valid only if the defendant contracted to deliver the drugs for export to Russia with a guarantee of their exportability to that country. There is nothing in the terms of the sale, which consists of the defendant’s proposal to sell, the decedent’s bid in response thereto, and the defendant’s acceptance of the same, to justify this contention. There was no representation or guarantee on the part of the defendant in any way that the goods were exportable. The proposal was for the unconditional sale of the drugs at fixed prices shown in an attached list f.o.b. points of storage. The bid was for the unqualified purchase of the entire lot offered, at the prices stated, accompanied with a certified check for 10 percent of the amount of the bid. The acceptance of the bid and the award of the drugs to decedent were likewise unqualified. The embargo against the exportation of the goods to Russia did not affect the contract between the decedent and the defendant, but only the agreement between the decedent and the Soviet agents, to which the United States was not a party. The Government had title to the goods sold, was in possession of them, and was able and ready to make delivery in accordance with contract terms. In these circumstances the existence of an embargo against the exportation of the goods to Russia at the time the award was made is immaterial and in no way affected the validity of the contract, and this would also be true had the embargo been established subsequent to the sale. Horowitz v. United States, 267 U.S. 458. It is not necessary to consider what effect the existence of the embargo would have had on the validity of the contract if the Government had in fact sold the drugs for export to Russia, as the plaintiffs contend it did. The drugs were not so sold, and that question is not in the case, in which respect it is clearly distinguished from Bencoe Exporting & Importing Co. v. Erie City Iron Works et al., 280 Fed. 690, cited and relied on by plaintiffs. The contract was valid and the defendant acted well within its rights in refusing to cancel it, and in retaining the balance of the deposit money applicable to the drugs not withdrawn and paid for by the decedent pending an adjudication *527 of the rights and liabilities of the parties under the contract, the decedent being entitled to credit for the amount withheld.
the counterclaim;
The plaintiffs in the brief question the authority of Lang-ham to act for the decedent in requesting an extension of time of 90 days in which to dispose of the drugs in the domestic market after they had been awarded decedent and after the Soviet agents had refused to accept them and advance the purchase price, and also his authority to request the defendant to resell them after Langham’s and decedent’s efforts to sell them had proved fruitless. The facts do not support this contention. Decedent and Langham were partners in buying and selling surplus Government property. They had organized a company for the express purpose of carrying on that business, and the bid was submitted in the name of the company. Langham was the active member of the company and conducted all the negotiations leading up to the purchase of the goods. He visited the department and talked with defendant’s officers having to do with the sale. He conducted the negotiations with the Soviet agents and personally made the arrangements with them whereby they were to repurchase the argyrol and protargol and furnish the funds to pay the defendant for them. He conducted all the negotiations with officers of the Government looking to the procurement of an export license for the drugs. He made diligent efforts during the extended period for making payment to sell the drugs on the domestic market. He requested the defendant through the Langham Company to resell the drugs for the decedent. That he acted as the authorized agent of the decedent in all these matters cannot be doubted. However that may be, the defendant had the right to resell the drugs for the decedent’s account when he defaulted in his contract obligation to withdraw and pay for them, whether the decedent requested such action or not. Upon the decedent’s failure to take and pay for the drugs the defendant had a choice of three methods to indemnify itself: (1) It could store and retain the goods for the *528 decedent and sue him for the entire purchase price; (2) it could resell the goods, acting as agent for the decedent, and recover the difference between the contract price and the amount obtained on such resale, or (3) it could keep the goods as its own property and recover the difference between the market price at the time and place of delivery and the contract price. Lamport Mfg. Co. v. United States, 65 C.Cls. 579. The defendant chose the second method and it is immaterial whether that action was taken at the request of the decedent or of its own volition.
Plaintiffs make the further contention that recovery may not be had upon the counterclaim for the reason that decedent’s bid was invited and made on the assurance that the defendant had established and would maintain a fixed price policy in the domestic market which would enable him to resell the drugs in that market without loss, which policy the defendant abandoned by inviting bids on the argyrol and protargol, contained in list no. 2, without fixing the prices thereon, thus destroying the domestic market and making it impossible for either the decedent or the defendant to dispose of the drugs in question except at a loss. It is further contended that the defendant has failed to establish the counterclaim by proper proof.
The facts do not support the contention that the decedent’s bid was invited on the assurance that the defendant had established and would maintain a fixed price policy in the domestic market in respect to argyrol and protargol that would enable the decedent to resell the drugs in that market without loss. The offer under which the purchases were made stated that the surplus drugs and chemicals described in List No. 1 would be open for sale to the public from March 5, 1920, to April 5, 1920, at the same minimum quantities and prices stated in the original offer of January 3, 1920, in which the same drugs had been offered for sale to State and municipal hospitals, free clinics, and similar institutions. The offer to sell these drugs and chemicals at a fixed price during a definite and limited period cannot be construed as an assurance that the Government would maintain such fixed prices in subsequent offers for sale of the same kind of drugs stored at other points. The pro *529 posal under which decedent’s purchases were made had reference only to the particular drugs described in List No. 1. It contained no assurance that the prices stated in the proposal would be maintained in subsequent sales. Had the decedent purchased only a portion of the drugs described in the proposal instead of the entire lot, it could not, we believe, be contended that the Government was contractually precluded from disposing of the remaining drugs at a price less than that at which they were offered in that particular sale until decedent had disposed of his purchases. Aside from this, it is not shown that the defendant’s offer to sell the argyrol and protargol described in List No. 2 on the informal bids and at prices not fixed in the proposal destroyed the domestic market for these drugs and prevented the decedent from disposing of them, except at a loss. In fact, the contrary is clearly established by plaintiffs’ witness, Langham, who stated that he could have sold all the drugs purchased by decedent to certain jobbers and wholesalers had it not been for the pressure brought to bear on prospective purchasers by the manufacturers, who had originally sold the drugs to the Government, by threatening to curtail their credit limits if they purchased the decedent’s drugs. The inability of the decedent, therefore, to sell on the domestic market at a profit, the drugs purchased by him from the defendant, resulted from no act of the defendant.
As to the contention that the defendant has not sustained the counterclaim by proper proof, it is sufficient to point out that plaintiffs have stipulated that the defendant received the prices set out in the findings for the drugs upon their resale for the decedent’s account, and that such prices were the best obtainable market prices at the time the sales were made. The defendant at all times made diligent efforts to resell the drugs, after the decedent failed to accept delivery and pay for them, until they were finally disposed of, and exercised reasonable care and judgment in making the resales. The defendant sustained a loss on the resale of the drugs of $114,815.57 after giving the decedent credit for $20,784.28, the amount of the deposit applicable to the drugs not- withdrawn.
*530 The defendant is entitled to recover on the counterclaim, and judgment in favor of the United States for $114,815.57 is awarded. It is so ordered.
Whaley, Judge; Green, Judge; and Booth, Chief Justice, concur.
Littleton, Judge, took no part in the consideration or decision of this case.